IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TERESA MUFFOLETTO

　　　　　　Plaintiff,

　　vs.

CHRISTUS ST. VINCENT REGIONAL
MEDICAL CENTER, *et al.*,

　　　　　　Defendants.

No. 14-CV-0810-MV-SCY

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion for Summary

Judgment and Memorandum in Support [Doc. 54].  Plaintiff timely filed a Response

[Doc. 57] and the Defendants replied [Doc. 59].  The Court, having considered the

Motions, briefs, attached materials, relevant law, and being otherwise fully

informed, finds that the Defendants' Motion is well-taken and will be **GRANTED**.

## BACKGROUND

**I.　Plaintiff's Employment History**

　　　From February 13, 2008 until her resignation on July 3, 2012, Plaintiff

Teresa Muffoletto worked as a registered nurse in the Emergency Department of

the Christus St. Vincent Regional Medical Center in Santa Fe, New Mexico ("CSV").

Defendants' Undisputed Material Facts ("DUMF") ¶ 1.  At the time that CSV first

hired Muffoletto, she was 56 years old.  *Id.*  During this period, Muffoletto was

supervised, in various capacities, by Defendant Kelly Bernatene, the Emergency

Department Director, Defendant Maclovio "Mac" Medina, the Clinical Manager, and Defendant David Garduno, a Clinical Supervisor. *Id.* ¶ 2. From the facts presented to the Court, it seems that Plaintiff's employment proceeded without incident until "early 2012" when she "return[ed] [to] unrestricted duty" after an injury. *Id.* ¶ 4.

## II.    The Early 2012 Incident

At some point in "early 2012," while Muffoletto was working at the triage intake station of the Emergency Department, a patient, whom Muffoletto knew to have a history of coronary issues, presented with cardiac distress. *Id.* ¶ 4. Given that such potentially severe conditions must be diagnosed and resolved expeditiously, CSV has adopted "protocols [that] require a patient in cardiac distress to have an electrocardiogram within seven to ten minutes" of their arrival in the Emergency Department. *Id.* It is undisputed that it "took at least 40 minutes before someone came to do an EKG [electrocardiogram] on this patient." Doc. 54-1 at 36. However, Plaintiff contends that she was left "alone at the triage window without any assistance, contrary to acceptable practices" and that she did her best to manage the situation, including calling "the Charge Nurse twice to get assistance with the multiple patients in the Emergency Department." Plaintiff's Response to Facts Offered by the Defendants ("PRFOD") ¶ 4. By contrast, Defendants assert that "a security guard recognized the severity of the situation and took Muffoletto's patient into the ED for immediate assistance." DUMF ¶ 4. Ultimately, it was learned that "the patient was indeed having another heart attack." *Id.*

2

After this incident, Clinical Manager Medina investigated the matter in order to determine what had transpired. *Id.* ¶ 5. While Plaintiff may "dispute the decision made by" Medina, PRFOD ¶ 6, she does not dispute that he "gave Muffoletto a corrective action and final warning" and that she "understood that, ***in Medina's judgment***, she had not done enough to ensure safe patient care and that she was subject to termination for any additional lapses." DUMF ¶ 6.

## III.    The April 2012 Incident

In April 2012, "Muffoletto discharged a patient without having a doctor's order." *Id.* ¶ 7. While Defendant attempts to put this fact into dispute through a self-serving affidavit, the Court will disregard those portions of the affidavit that conflict with Muffoletro's prior deposition testimony. *See, e.g.*, *Burns v. Bd. of Cnty. Comm'r of Jackson Cnty.*, 330 F.3d 1275, 1282 (10th Cir. 2003) (explaining that an affidavit may be treated as a sham where "the affiant was cross-examined during his earlier testimony," had "had access to the pertinent evidence at the time of his earlier testimony," and was not confused during earlier testimony).

Muffoletto testified in her deposition that "the doctor was standing up with the patient's chart" and that "at one point it ***sounded like*** she said, go ahead and discharge the patient." Doc. 54-1 at 38 (emphasis added). Apparently, Muffoletto discharged this patient, realized her mistake, and then called the patient, informing her to return. *Id.* Muffoletto testified that during this call she said, "I'm sorry, you know, this is obviously my error or my fault." *Id.* *See also* Doc, 54-3 at 10 ("in this instance, Teresa had discharged a patient without a discharge order."). While the

patient "was back in the ER within 15 minutes," this incident represents an error nonetheless.  Doc. 54-1 at 38-39.

As a result of this episode, Medina again conducted an investigation, and, indeed, did not want "to rush into a decision" regarding how to move forward.  Doc. 54-3 at 11.  Ultimately, Medina concluded that the incident was not particularly severe, so he documented "the conversation with Teresa, so that way there would be a record," but he took "no corrective action" because "it wasn't something that was absolutely horrible."  *Id.*  Notably, Plaintiff's sole objections to these facts are that the "documentation is unsigned by Defendant Medina" and that this document "was made twenty (20) or twenty-one (21) days after the alleged incident occurred."  PRFOD ¶ 8.  This argument however, does nothing to undercut the value of Medina's above-quoted deposition testimony, which draws from his personal knowledge, rather than merely a document.

## IV.    The May 11, 2012 Incident

On May 11, 2012 Muffoletto documented that "she had administered a controlled medication that she had not actually given."  DUMF ¶ 9.  It is undisputed that, on the date in question, a patient "had been suffering seizures when he arrived in the ED."  *Id.* ¶ 11.  Consequently, a physician "ordered administration of Ativan, which can prevent seizures."  *Id.*  Plaintiff, "the nurse assigned to this patient," indicated on the chart that the patient had received the drug, but she did so before actually administering the Ativan.  *Id.*  Unfortunately, when Plaintiff returned to the patient's room with the medication, he had already been taken away for a CT

4

scan; the patient suffered another seizure in the CT department.  *Id.*  While Plaintiff argues that "pulling and charting medications prior to the administration of the medication occurs routinely in" the Emergency Department, PRFOD  ¶ 11, she also agreed at her deposition that if "a medication is charted, it should be given."  Doc. 54-at 8.  There does not appear to be any conflict in this testimony; it is consistent to say that a procedure should be charted immediately before it is performed and that all procedures that are charted should actually be performed.  Whatever the case, it can hardly be disputed that failing to administer a drug as described in the chart constitutes an error of some variety.

## V.    The May 25, 2012 Incident

"During the evening of May 25, [2012]" Plaintiff "was assigned to care for four patients during the last several hours of her shift."  DUMF ¶ 15.  At approximately 7:00 p.m., a "male with possible sepsis and hypotension" arrived at the Emergency Department.  *Id.*  While Plaintiff disputes that this patient arrived at 7:00 p.m., the Court fails to apprehend the significance of his precise arrival time; further, Plaintiff does not provide the "documented evidence of this offered fact" to which she alludes.  PRFOD ¶ 57.  "Another nurse, Katie Doyle" moved this patient to a "room assigned to Muffoletto and took initial vital signs."

The Parties dispute what happened next.  Defendants contend that "Muffoletto was sitting at the nurses' desk" and told Doyle that she was busy, rather than attending to the patient.  DUMF ¶ 15.  Plaintiff, by contrast, swears that she was not at the desk and that she did not tell nurse Doyle that she was too

5

busy to assist with a patient.  PRFOD ¶ 15.  Later that evening, two other nurses, Kim Quintana and Ann Monger rendered care to that patient; they started him on intravenous fluids, collected blood cultures, and emptied his urine bag.  DUMF ¶ 16. While these nurses do not appear to have charted their work, they informed Muffoletto of what they had done and she recorded it for them.  Doc. 54-1 at 40.

It is undisputed that, yet later that evening, Defendant Garduno "noticed that the patient was slouched, and sliding toward the foot of the bed."  DUMF ¶ 17. Defendant Garduno repositioned this patient with the assistance of a Charge Nurse and administered additional fluids.  *Id.*  After attending to the patient, Garduno noticed a dose of an antibiotic resting on the nurses' desk that should have been given to that patient; he promptly administered the medicine.  *Id.*  Based on these events, Garduno believed that "Muffoletto did not effectively perform her patient care duties during her shift."  *Id.* ¶ 18.  Plaintiff admits that she "cannot credibly dispute Defendant Garduno's beliefs."  PRFOD ¶ 18.

## VI.    Muffoletto is Placed on Administrative Leave

"After [Defendant] Medina learned" of the events of May 25, he began an investigation into Muffoletto's conduct.  DUMF ¶ 19.  While Plaintiff insists that Medina's testimony is self-serving, she offers nothing to refute Defendants' sworn statements.  *See* PRFOD ¶ 19.  Given the risks posed to the patient by the May 25 incident, Medina consulted with Bernatene and ultimately decided to place Muffoletto on unpaid administrative leave pending the conclusion of his

investigation.  *See* DUMF ¶ 19.  *See also* Plaintiff's Statement of Undisputed Facts

("PSUF") ¶ C.

Medina then "reviewed the pertinent medical records, discussed the incidents

with the nurses who assisted Muffoletto, and obtained a written summary from

Garduno."  DUMF ¶ 20.  While "Plaintiff disputes the credibility that Defendant

actually reviewed the pertinent medical records and interviewed any other nurse as

he does not specifically recollect doing the investigation in this matter," the

evidence supports Medina's version of events.  First, Medina testified that as part of

his "normal practice" in investigating incidents he "would investigate or talk to

nurses, the individual that was involved, whomever [sic] lodged the complaint."

Doc. 54-3.  Second, Garduno testified that he spoke with Medina and that he

documented the events in e-mails.  Doc. 54-4 at 16.  This statement is corroborated

by an e-mail that Garduno sent to Medina on June 3, 2012, in which he relates his

recollection of the events of May 25.  *See* Doc. 54-4 at 20.  Third, Muffoletto admits

that a meeting was held on this matter on June 11, 2012, at which the incidents of

May 11 and May 25 were discussed and that Medina was "prepared" to discuss

what had occurred; such preparedness implies investigation.  Doc. 54-1 at 44.  *See*

*also* DUMF ¶ 21.  Absent any evidence to the contrary from Plaintiff, the Court

finds that Medina conducted the investigation as indicated.

Evidently, after the June 11 meeting, "Medina did not think that Muffoletto

provided an excusable explanation for improperly charting the Ativan

administration or failing to correct her erroneous entry" and similarly concluded

that she had not given "a reasonable justification for what he regarded as her failure to provide adequate patient care." *Id.* ¶ 21. "Based on the accumulation of incidents in 2012, Medina concluded that Muffoletto's pattern of errors and poor judgment showed that it was no longer safe to entrust her to care for patients in the demanding environment" of the Emergency Department. *Id.* ¶ 22. Similarly, "Bernatene agreed that, based on the incidents described above, it was no longer safe to allow Muffoletto to work as a staff nurse in the ED and recommended that she not return to the department." *Id.* ¶ 23. While Plaintiff "vehemently disputes" these facts "to the extent [they] impl[y] that the quality of nursing care provided by the Plaintiff compromised the safety of the patients under her care," she offers no evidence that Medina and Bernatene did not arrive at their conclusions in earnest. PRFOD ¶¶ 21-23.

## VII.    Proposed Transfer to Another Department

Sometime after Medina and Bernatene decided that Plaintiff should no longer work in the Emergency Department, "Human Resources Director Sandra Dominguez" and "Vice President of Human Resources Pearl Mohnkern" reached out to "Muffoletto regarding the possibility of transferring [Plaintiff] to another department that might be a better match for her skills. DUMF ¶ 24. Indeed, Plaintiff concedes that Dominguez and Mohnkern proposed transferring Muffoletto to the Intensive Care Unit. PRFOD ¶ 24. Ultimately, however, after meeting with the ICU director, Muffoletto decided that joining that department "wouldn't be feasible because [she would] need a full refresher course," despite the fact that

8

Mohnkern had said that CSV "wouldn't suggest [the transfer] if we didn't think you could do it." Doc. 54-1 at 45. Moreover, even after Muffoletto resigned, Dominguez informed her that "she had some other options [for employment at CSV] that she wanted to discuss with [her]." *Id*. at 46. Muffoletto evidently declined these offers.

## VIII.   **Muffoletto Resigns**

"On July 3, 2012 Muffoletto resigned" her position at CSV. DUMF ¶ 25. Plaintiff does not deny that her resignation letter "was the first and only time during her employment, among various written communications and other opportunities, that she presented a report in which she alleged age discrimination." *Id*. Plaintiff adds, however, that she "was forced to resign based on the disparate treatment due to her age and the hostile and toxic work environment created by the Defendants," as reflected in the Charge of Discrimination she filed. PRFOD ¶ 25. Plaintiff brought suit against Defendants in the First Judicial District Court of New Mexico, alleging violations of the New Mexico Human Rights Act ("NMHRA") and the Age Discrimination in Employment Act ("ADEA"). *See generally* Doc. 1-1. Defendants timely removed the action to this Court. *See generally* Doc. 1.

## DISCUSSION

## I.   **Punitive Damages**

As an initial matter, the Court will dismiss Plaintiff's "cause of action" for punitive damages *sua sponte*. Punitive damages, as their name indicates, are a form of relief, not an independent claim. *See, e.g.*, *Mason v. Texaco, Inc.*, 948 F.2d

1546, 1554 (10th Cir. 1991) ("A punitive damage claim is not an independent cause of action or issue separate from the balance of a plaintiff's case.  It is part and parcel of a liability determination."); *Howell Petroleum Corp. v. Leben Oil Corp.*, 976 F.2d 614, 622 (10th Cir. 1992) ("A request for damages, however, does not constitute a cause of action; rather damages are a remedy for a legal wrong.").  Whether or not punitive damages might be available to Plaintiff if she prevails on one of her remaining claims is a separate matter that will be determined below, but under no circumstances do punitive damages constitute a separate basis for relief and therefore cannot be maintained in this suit as an independent "cause of action."

## II.    Administrative Exhaustion Under the NMHRA

Although the NMHRA provides for individual, personal liability in discrimination cases, it also demands that "a plaintiff must exhaust his or her administrative remedies ***against a party*** before bringing an action in district court ***against that party***."  *Sonntag v. Shaw*, 22 P.3d 1188, 1193 (N.M. 2001) (emphasis added).  *See also Hunt v. Central Consol. Sch. Dist.*, 951 F. Supp. 2d 1136, (D.N.M. 2013) ("The NMHRA allows individuals to bring a lawsuit in the appropriate district court after exhausting their administrative remedies."); *Bates v. N.M. Corr. Dep't*, No. CIV 08–1013, 2010 WL 4339367, at *7 (D.N.M. Sept. 30, 2010) (Browning, J.) ("NMHRA claims must be administratively exhausted before being brought in federal court.").  The operative Charge of Discrimination form in this case names only CSV; consequently, Plaintiff may not maintain any NMHRA claims against the individual Defendants in this action.  *See* Doc. 54-1 at 95.

The New Mexico Supreme Court decision in *Lobato v. State Env't Dept.* is not to the contrary.  There, the court reiterated that the "NMHRA creates a cause of action against individuals, which necessarily requires the naming of these individuals in the administrative complaint, and requires administrative exhaustion against these individuals as a prerequisite to judicial remedies." *Lobato v. State Env't Dept.*, 267 P.3d 65, 68 (N.M. 2011).  It continued, however, that the agency's "official Charge of Discrimination form" provided by the Human Rights Division "creates a trap for unwary claimants to forfeit their statutory rights and judicial remedies." *Id.*  This analysis, coupled with other factors, including the fact that plaintiff had filed his Charge of Discrimination without the advice of counsel, led the New Mexico Supreme Court to conclude that "***in these limited circumstances*** the requisite administrative exhaustion of the NMHRA should not be required in order for Plaintiff to pursue his judicial remedies under the statute." *Id.* at 69.

No such circumstances exist here.  To the contrary, by the time Muffoletto signed and submitted the Charge of Discrimination form, she had already consulted with an attorney and, therefore, does not fit the New Mexico Supreme Court's description of "unwary" plaintiffs.  *Compare* Doc. 54-1 (the Charge of Discrimination form was signed in September 2012) at 95 *with* Doc. 54-1 at 44 (plaintiff testified that she consulted with an attorney about this matter while still employed with CSV) *and* Doc. 57at 23-24 (Plaintiff does not dispute in her Response Defendants'

argument that she was represented by counsel when she filed her Charge of Discrimination).

Moreover, the website for the state agency states that "Effective March 1, 2010, parties represented by counsel will be expected to prepare their own FORMS for initiating a Human Rights Claim. Parties who are not represented by an attorney should contact the Human Rights Bureau for assistance in completing the necessary paperwork to file a complaint." *Filing a Complaint of Discrimination*, NEW MEXICO DEP'T OF WORKFORCE SOLUTIONS, http://www.dws.state.nm.us/Labor-Relations/Human-Rights/Filing-a-Complaint-of-Discrimination (last visited Nov. 3, 2015) (capitalization original).  Hence, given that Muffoletto was represented by an attorney at the time she submitted her Charge of Discrimination, she failed to comply with the expectations of the agency and, therefore, should not now be allowed to complain about deficiencies in the form.  At the very least, she should have consulted with the agency prior to filing her Charge of Discrimination on the form provided online, as requested on the website.

Viewed in this light, the Court sees no reason no ignore the ordinary rule that a plaintiff must exhaust her administrative remedies ***as to each individual Defendant*** prior to bringing a civil action.  Consequently, this Court will dismiss all NMHRA claims against those individual Defendants not named in the Charge of Discrimination that serves as predicate to this suit.  Therefore, the NMHRA claims against Defendants Bernatene, Medina, Garduno, and Does 1-10, whoever they may be, are dismissed.

### III.    Individual Employee Suits Under ADEA and *Respondeat Superior*

It is now undisputed in this Circuit that "individual employees are not liable under the ADEA." *Bates v. New Mexico Corrections Dep't*, No. CIV 08–1013 JB/RLP, 2010 WL 4339367, at *9 (D.N.M. Sept. 30, 2010) (Browning, J.).  *See also Carpenter v. New Mexico*, No. CV 10–0112 JB/WDS, 2010 WL 2292890, at *10 (D.N.M. May 26, 2010) (dismissing Title VII and ADEA claims against individual employees "because they are not [plaintiff's] employer as defined in Title VII and the ADEA, and cannot be held personally liable for her claims of discrimination and retaliation").  *Cf. Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1083 n.1 (10th Cir. 2007) ("Under long-standing circuit precedent, supervisors and other employees may not be held personally liable under Title VII.").  Accordingly, the Court will dismiss all individual-capacity ADEA claims against Defendants Bernatene, Medina, Garduno, and Does 1-10.

Similarly, Plaintiff abandons its claims for "personal civil liability" under a theory of *respondeat superior* against the individual Defendants.  *See* Doc. 57 at 22 ("Plaintiff does not dispute that the case law suggests that personal civil liability may not be imposed congruent with the doctrine of respondeat superior.").  The Court concurs with this conclusion, particularly because ADEA makes clear that all liability ultimately rests with the employer.  *See, e.g.*, *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010) (explaining that under ADEA, "[a]n employer will be strictly liable for a supervisor's proven discrimination where such

13

discrimination results in an adverse employment action.").  Therefore, the Court will dismiss all *respondeat superior* claims against the Individual Defendants.

## IV.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 directs the Court to enter summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In evaluating the remaining portions of the Motion before it, the Court will "consider all facts and evidence in the light most favorable to the part[y] opposing summary judgment."  *Ron Peterson Firearms, LLC v. Jones*, 760 F.3d 1147, 1154 (10th Cir. 2014).  In judging whether a *genuine* issue of material fact exists, the Court asks "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way" and "if under the substantive law [the fact] is essential to the proper disposition of the claim."  *Varnell v. Dora Consol. School Dist.*, 756 F.3d 1208, 1212 (10th Cir. 2014) (internal quotation marks omitted).  Thus, "a mere factual dispute need not preclude summary judgment."  *Sapone v. Grand Targhee, Inc.*, 308 F.3d 1096, 1100 (10th Cir. 2002).

## V.    The ADEA Discrimination Claim Against CSV

a.  *Relevant Law*

Succinctly stated, the Age Discrimination in Employment Act prohibits employers from discriminating against individuals with respect to the terms of their employment on the basis of their age.  *See, e.g.*, 29 U.S.C. § 623(a)(1) ("It shall be

unlawful for an employer -- to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."). "To prove a prima facie case of age discrimination [under ADEA], a plaintiff must show [that]: 1) she is a member of the class protected by the [ADEA]; 2) she suffered an adverse employment action; 3) she was qualified for the position at issue; and 4) she was treated less favorably than others not in the protected class." *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1279 (10th Cir. 2010) (some modifications original; internal quotation marks omitted).

A plaintiff bears the "ultimate burden of proving her employer intentionally discriminated against her." *Riser v. QEP Energy*, 776 F.3d 1191, 1199 (10th Cir. 2015). A plaintiff may meet this burden with either direct or circumstantial evidence. *See Adamson v. Multi Cnty. Diversified Servs. Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) ("A plaintiff can prove age or sex discrimination with direct or circumstantial evidence."). However, where, as here, a plaintiff relies on "circumstantial evidence to show discriminatory intent, the burden-shifting framework of [*McDonnell Douglas*] applies." *Riser*, 776 F.3d at 1199-1200. *See also Bertsch v. Overstock.com*, 684 F.3d 1023, 1028 (10th Cir. 2012) ("Rarely will a plaintiff have direct evidence of a retaliatory motive; most plaintiffs attempt an 'indirect,' burden-shifting case.").

Under this analysis, "[i]f a terminated employee can make a *prima facie* case of discrimination, the burden shifts to the employer to articulate a

nondiscriminatory reason for firing the employee.  If the employer can do that, the employee picks up the burden once more and can survive summary judgment by identifying evidence that could support a reasonable jury's concluding that the employer's proffered rationale is a mere pretext for discrimination." *Roberts v. Int'l Bus. Machs. Corp.*, 733 F.3d 1306, 1308 (10th Cir. 2013).

      b.  *Muffoletto's Prima Facie Case*

Plaintiff cannot establish a *prima facie* case for age discrimination.  While Defendants concede that (1) Muffoletto was a member of the protected class, and that (2) she suffered adverse employment action, she cannot demonstrate that she was treated less favorably than other employees not in the protected class.  While Plaintiff alleges that "Defendant Garduno, Kim Quintana, Katie Doyle, Tim Medlin and Ann Monger are all younger employee nurses than the Plaintiff," she quite simply has not alleged any facts that would lead this Court to conclude that any of those individuals is not a member of the protected class.  In fact, other than Garduno, who the Plaintiff admits was forty-one (41) years old in 2012, and therefore a member of the protected class, the Court has no factual basis on which to determine the respective ages of the remaining persons listed above.  *See* 29 U.S.C. § 631 ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age).  Therefore, there is no reason to believe that their treatment is relevant to the final *McDonnell Douglas* element such that Plaintiff has not stated a *prima facie* case for age discrimination under ADEA.

Moreover the record indicates that, although CSV denies that any single nurse "replaced" Muffoletto, several of the nurses hired in the months after Muffoletto was suspended were ***also*** members of the protected class. Indeed, the nurse hired by, or transferred to, the Emergency Department soonest after Muffoletto's suspension was born February 2, 1969, and was therefore forty-three (43) years old at the time she was hired. Of the remaining fourteen (14) nurses hired by, or transferred to, the Emergency Department during the remainder of the 2012 calendar year, six (6) were forty years of age or older at the time of the employment decision; the oldest was fifty-six years old at the time of the relevant employment action. *See* Doc. 57-6 at 2-3. While "an employer's decision to replace an older worker with a significantly younger one can support an inference of intentional age discrimination even when both persons are ADEA class members," it does not appear that there is any pattern in CSV's employment decisions that would indicate discriminatory intent. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 78 (2d Cir. 2005).

## VI.    NMHRA Claim Against CSV

Although the NMHRA does not contain a statutory definition of the protected class for the purposes of age discrimination, the New Mexico Supreme Court has held that "40 years old marks the minimum age in the protected age class in cases of employment discrimination under the New Mexico Human Rights Act." *Cates v. Regents of N.M. Inst. of Mining and Technology*, 954 P.2d 65, 70 (N.M. 1998). This holding, coupled with the New Mexico Supreme Court's application of the

*McDonnell Douglas* burden-shifting regime to age discrimination cases under the NMHRA, is fatal to Plaintiff's NMHRA claims for discrimination against CSV. *See, e.g.*, *Clayton v. Vanguard Car Rental U.S.A., Inc.*, 761 F. Supp. 2d 1210, 1250 (D.N.M. 2010) ("The Supreme Court of New Mexico applies the framework that the Supreme Court of the United States established in *McDonnell Douglas Corp. v. Green* '[w]hen considering a violation of the NMHRA.'"). For the reasons described above, Plaintiff cannot establish a *prima facie* case of discrimination because there is no factual basis to believe that any of the persons mentioned in her Response is not a member of the protected class. Thus, Defendants are entitled to judgment as a matter of law as to this cause of action.

## VII.    Retaliation Claim Against CSV

In her Third Cause of Action, Plaintiff alleges that Defendants' conduct "constitutes retaliation against Plaintiff because she engaged in activities protected by the ADEA and NMHRA." Doc. 1-1 ¶ 67. Plaintiff cannot prevail on such a claim. Plaintiff correctly identifies that in order to demonstrate retaliation under ADEA and the NMHRA, she must establish "that (1) he or she engaged in a protected activity, (2) he or she suffered a material adverse action, and (3) there was a causal connection between the protected activity and the adverse action." *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015). *See also Juneau v. Intel Corp.*, 127 P.3d 548, 552 (N.M. 2005) ("To establish a prima facie case of retaliation [under the NMHRA], Plaintiff must show that (1) he engaged in protected activity, (2) he was subject to adverse employment action subsequent to, or contemporaneous with

the protected activity, and (3) a causal connection exists between the protected activity and the adverse employment action.").

Plaintiff cannot meet this burden. As is evident from the factual recitation above, Plaintiff has not alleged that she engaged in protected activity until *after* the first adverse employment action about which she complains. Indeed, Muffoletto appears to recognize the weakness of this claim, as she abandons it entirely in her Response. *See* Doc. 59 at 12. The undisputed material facts therefore demand that the Court enter judgment as a matter of law in favor of Defendants on this cause of action.

## VIII.    Hostile Work Environment Under ADEA and the NMHRA

In her Fourth Cause of Action, Plaintiff alleges that CSV fostered a hostile work environment. Doc. 1-1 ¶¶ 70-72. Her sole support for this contention is an e-mail, sent in "November of 2010" wherein an Emergency Department physician "noted that Defendant Bernatene was in the process of giving people authority and holding people accountable, and referenced '[o]ld battle axes (MD's [sic] and RN's [sic]) who walk around and bitch undermine our success.'" Doc. 57 at 22 (quoting Doc. 54-1 at 66). Such an e-mail is not sufficient to sustain a hostile work environment claim for two independent reasons.

First, to determine whether a working environment is sufficiently hostile or abusive to be actionable under ADEA, the Court must "examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or

19

humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *MacKenzie v. City and Cty. of Denver*, 414 F.3d 1266, (10th Cir. 2005).  Additionally, "the environment must be both subjectively and objectively hostile or abusive." *Id.*  Here, a single infelicitous e-mail that was not addressed to Muffoletto simply cannot meet this standard. *See generally* Doc. 54-1 at 66.  That is, as a matter of law, Plaintiff cannot prove a hostile work environment based on one, modestly offensive "utterance" that does not appear to have interfered with her work. *See, e.g.*, *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) ("A plaintiff does not make a showing of a pervasively hostile work environment by demonstrating a few isolated incidents.").  This Court's analysis is identical under the NMHRA because New Mexico has largely adopted federal Title VII and ADEA analysis for the purposes of interpreting the NMHRA. *See, e.g.*, *Hunt*, 951 F. Supp. 2d at 1249-50.

Second, ADEA "provides that 'no civil action may be commenced' in federal court unless the would[-]be plaintiff first files a grievance with the appropriate administrative agency—and does so 'within 300 days after the alleged unlawful practice occurred' where (as here) a state administrative agency process exists to remedy the alleged discrimination." *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1176 (10th Cir. 2011) (quoting 29 U.S.C. § 626(d)(1)(B)).  The only Charge of Discrimination in this case was filed in September 2012, such that the contents of an e-mail from November 2010 may only be considered if they form part of a

"continuing policy or practice that includes the act or acts within the statutory period." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 632 (10th Cir. 2012).

For these purposes, a "series of alleged events comprises the same hostile environment where the pre-and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Duncan v. Manager, Dept. of Safety, City and Cty. of Denver*, 397 F.3d 1300, 1308–09 (10th Cir.2005). In the instant case, there can be no suggestion that this single e-mail represents "relatively frequently occurring" events that "were perpetrated by the same managers. This is fatal to Plaintiff's hostile work environment claim under ADEA. Thus, Defendants are entitled to judgment as a matter of law on Plaintiff's hostile work environment claims under ADEA and the NMHRA.

## CONCLUSION

For the reasons discussed above, there is no dispute of material facts in this case that would necessitate a trial and Defendants are entitled to judgment as a matter of law as to each of Plaintiff's claims.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment and Memorandum in Support [Doc. 54] is **GRANTED.  Judgment will be entered by a separate order.**

Dated this 19th day of November, 2015.

_____
**MARTHA VÁZQUEZ**
UNITED STATES DISTRICT JUDGE

**Paul M. Dominguez**
Will Ferguson & Associates
Albuquerque, New Mexico
***Attorney for the Plaintiff***

**Ellen S. Casey,** *et al.*
Hinkle, Hensley, Shanor & Martin, LLP
Santa Fe, New Mexico
***Attorneys for the Defendants***